# In the United States Court of Federal Claims

(Bid Protest)

| | |
|---|---|
| SARONIC TECHNOLOGIES, INC,<br><br>Plaintiff,<br><br>v.<br><br>THE UNITED STATES,<br><br>Defendant. | No. 26-358<br>(Filed Under Seal: October 23, 2026.<br>Reissued for Publication: November 12, 2026)* |

Anne Perry, Sheppard Mullin Richter & Hampton LLP, Washington, DC, for Plaintiff. Ryan E. Roberts, Katie A. Calogero, Christie M. Alvarez, and Lillia J. Damalouji, Sheppard Mullin Richter & Hampton LLP, Washington, DC, and Kendra L. Wharton, Wharton Law PLLC, Of Counsel.

Delisa M. Sánchez, Trial Attorney, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, Washington, DC, with whom were William J. Grimaldi, Assistant Director, Patricia M. McCarthy, Director, and Brett A. Schumate, Assistant Attorney General, for Defendant. Todd W. Muse, Attorney Advisor, Naval Sea Systems Command Office of Counsel, Washington, DC, Of Counsel.

## MEMORANDUM OPINION

**KAPLAN, Judge.**

This pre-award bid protest arises out of a challenge to the acquisition plan that the Naval Sea Systems Command ("NAVSEA") adopted to fulfill its requirements under the Littoral Combat Ship Mission Modules Development, Engineering, Production and Sustainment Program ("DEPS Program"). That acquisition plan, under which the Solicitation at issue in this case was published on January 16, 2026, contemplates that the Navy will employ a single contract vehicle to procure Operations and Sustainment ("O&S" or "sustainment") services worldwide, covering both littoral combat ship ("LCS") mission modules and small unmanned surface vehicles ("sUSVs").[1]

Plaintiff Saronic Technologies, Inc. ("Saronic") is a small-business, nontraditional defense contractor that designs and produces autonomous surface vessels like the sUSV. Compl. ¶¶ 1, 17, ECF No. 1. It holds a prototype Other Transaction ("OT") agreement to produce the

* This Opinion was initially issued under seal, and the parties were given the opportunity to request redactions. The parties did not propose any redactions. Therefore, the Court reissues this Opinion for publication in its original form.

[1] sUSVs are sometimes referred to in the record as small unmanned surface vessels, rather than small unmanned surface vehicles.

Corsair sUSV, a 24-foot unmanned speedboat. Compl. ¶¶ 17, 20. Saronic alleges that it lacks the capability to perform the requirements set forth in the Solicitation for O&S services for the mission modules, but that it could provide such services to the Navy on a commercial basis for the sUSVs. Tr. of Oral Arg. at 6 [hereinafter Tr.], ECF No. 39.

Saronic contends that when the Navy issued a Solicitation that included both O&S services for mission modules and O&S services for sUSVs, it violated 10 U.S.C. § 3453, which obligates agencies to ensure that, "to the maximum extent practicable—the requirements of the agency with respect to a procurement of . . . services . . . are defined so that commercial services . . . may be procured to fulfill such requirements." 10 U.S.C. § 3453(a)(2). "Instead of identifying and segregating services that could be fulfilled by commercial service providers," Saronic claims, "the Agency bundled together a variety of tasks for the [littoral combat ships] and sUSVs that, when combined, can only be performed by a large, non-commercial, traditional defense contractor." Compl. ¶ 10. Saronic also asserts that the Navy incorporated terms and conditions into the Solicitation that "preclude[d] commercial service providers from competing, and in some cases, actually penalize[d] offerors for offering commercial services with their commercial terms." Id. Finally, it argues the Navy "should have set aside the sUSV O&S portion of the Solicitation for small businesses . . . ." Id. ¶ 12.

The government, for its part, has moved to dismiss the complaint under RCFC 12(b)(6). It alleges that—under the reasoning of Percipient.AI, Inc. v. United States, 153 F.4th 1226 (Fed. Cir. 2025) (en banc)—Saronic does not have statutory standing to pursue this protest under 28 U.S.C. § 1491(b)(1). On the merits, it contends that the administrative record "overwhelmingly demonstrates that the Navy conducted extensive market research, evaluated commercial alternatives, considered small business participation, assessed potential procurement structures, and reasonably concluded that integrated worldwide O&S support was operationally necessary to support active fleet readiness." Def.'s Mot. to Dismiss and, in the Alt., Resp. in Opp'n to Pl.'s Mot. for J. on the Admin. R. and Cross-Mot. for J. on the Admin. R. at 15 [hereinafter Def.'s Mot.], ECF No. 25.

On October 15, 2026, this Court issued an order denying the government's motion to dismiss, denying Saronic's motion for judgment on the administrative record, and granting the government's cross-motion for judgment on the administrative record. ECF No. 42. In this memorandum opinion, the Court provides the basis for those rulings.

## BACKGROUND

### I. The DEPS Program

As noted, the procurement at issue in this protest is for the worldwide provision of O&S services for littoral combat ship mission modules and sUSVs. As stated in the Acquisition Plan, the littoral combat ship "is the [Navy's] surface combatant class focused on support of littoral warfare and optimized for shallow seas and operations within 100 nautical miles of the shore." AR Tab 11 at 190 (Acquisition Plan). Its mission is to "counter littoral mine, surface, and air threats to assure maritime access for Joint Forces worldwide." Id.

Littoral combat ships "are equipped with modular mission packages that enable them to rapidly configure and execute a wide range of missions." Id.; see also AR Tab 10b at 162 ("The [littoral combat ship] uses a modular design approach where the seaframe provides sensors,

external communications, and a basic force application capability while the installed Mission Package (MP) provides tailored mission capabilities necessary to meet performance requirements."); AR Tab 7 at 87 ("The [littoral combat ship mission module] & sUSV Program provides tailored mission capabilities for use on the [littoral combat ship] Seaframe to counter unique littoral threats."). The following image is a diagram of a littoral combat ship:




AR Tab 3c at 26.

Organized in squadrons, littoral combat ships are modular, "single mission-focused ship[s] capable of defeating conventional and asymmetric access-denial threats" near the shore. AR Tab 10b at 162. Littoral combat ships "carr[y] limited onboard resources to maintain and repair the mission systems, support containers, support equipment, and other equipment that make up the [mission packages]." Id. at 163. Accordingly, "significant maintenance and repair work is assigned to an off-ship, shore-based workforce." Id.

Littoral combat ships are outfitted with mission packages tailored to suit the Navy's needs in different combat situations. Id. Mission packages "consist of one or more [mission modules] plus specifically trained crew and support aircraft." Id. Each mission module "contains mission systems, such as specialized sensors, vehicles, communication, and weapon systems," as well as computing and software support equipment. Id. These systems combine together "to perform a specific function or logical task related to a mission and their associated support equipment." Id. As depicted in the diagram below, sUSVs are among the mission systems that may be a part of mission modules:




AR Tab 3c at 20.

While littoral combat ships are manned by crews, sUSVs are unmanned vessels. AR Tab 10b at 164. sUSVs are much smaller than littoral combat ships and "can be deployed from various host platforms" but can also be operated from ashore. Id. at 163. The following

photographs include depictions of a variety of sUSVs:



AR Tab 3c at 31.

To ensure "rapid support" for both littoral combat ship mission modules and sUSVs, all assigned repair, maintenance, and field engineering support takes place at specific stateside and overseas locations using personnel stationed at those locations. AR Tab 10b at 162–63. Specifically, littoral combat ship mission modules and the sUSVs are "maintained, stored, and centrally managed through the Mission Package Support Facility (MPSF)" at Naval Base Ventura County Port Hueneme, located in California, and at Mission Module Readiness Centers ("MMRCs") in Singapore, Bahrain, San Diego, California, and Mayport, Florida. Id. at 163.[2]

[2] MPSFs "provide and coordinate maintenance, technical support, spares management, and ensure components (mission systems, mission modules, support containers, support equipment, or other equipment) are delivered to the Fleet." AR Tab 10b at 163. "The MPSF team plans, arranges, schedules, coordinates, and manages the execution of all maintenance and modernization tasks performed in the facilities or on the ships." Id. The team "coordinates with assigned Depots to schedule and ship [mission package] equipment to the Depots when work is not performed within the MPSF or MMRCs." Id. MMRCs are extensions of the MPSF that are "designed to have appropriate maintenance, administrative, and storage capabilities" and "provide the base for specific operations" such as pier-side maintenance and the installation or deinstallation of mission packages. Id.

## II. The Navy's Market Research Efforts

Prior to the events at issue in this case, the Navy procured both littoral combat ship mission module production hardware and O&S services for mission modules through the DEPS contract (Solicitation No. N00024-17-C-6311).[3] In October and November 2024, PMS 420, the Navy office within NAVSEA responsible for both the Littoral Ship program and sUSVs, conducted market research to determine if there were sources available that would allow it to break the requirements of the DEPS contract into "two smaller contract vehicles, one for production and one for sustainment." AR Tab 8 at 119.[4] The Navy sought information about "industry capabilities in the provision of production, manufacturing, engineering, and sustainment support for PMS 420's diverse [Mission Package] and sUSV product lines." Id.

The Navy divided its market research into two categories: (1) production hardware and (2) O&S support. Id. Production Hardware covered "all manufacturing and production of [littoral combat ship mission package] hardware end items" and "require[d] vendors capable of manufacturing to either build-to-specification or build-to[-]print, producing multiple systems, sub-systems and/or components, then integrating the delivered hardware into final end items." Id. "Operations and Sustainment Support strategy cover[ed] all operations and sustainment requirements during the fielding and deployment of all PMS 420 [mission package] and sUSV product lines, which are based on the overall [littoral combat ship] seaframe and evolving geographic Commander requirements both [stateside] and [overseas]." Id.

According to the Market Research Report that PMS 420 prepared, the Navy held an Industry Day on November 1, 2024. AR Tab 3a at 4. At the event, PMS 420 representatives briefed attendees about the DEPS Program. Id. They explained that the purpose of the Navy's market research was "to determine if sources exist that can satisfy the Navy's anticipated requirements for its [littoral combat ship mission module] and sUSV programs, with the focus on industry's capability to provide production, manufacturing, engineering and sustainment support for a variety of new and existing programs." AR Tab 3c at 51. Attendees were advised that information was being sought "to help determine the level of interest, technical and manufacturing capabilities, knowledge, experience level, and qualifications of Industry to meet the Government's needs." Id. PMS 420 further advised attendees that it was "approaching this opportunity with the goal of increasing competition and developing more informed future solicitations within current industry constraints." Id.

As part of the Industry Day, the government held a select number of one-on-one engagement sessions with individually approved companies. The sessions were "intended for industry to ask questions and provide feedback to the Navy." AR Tab 3a at 4. Twenty-four

---

[3] The administrative record does not reveal how O&S services for sUSVs are currently procured.

[4] PMS 420 is the Navy's shorthand for the Program Executive Office Unmanned and Small Combatants ("PEO USC"), Littoral Combat Ship Mission Modules Program Office. It is the "Navy's lead Program Office for the development of rapidly deployable modular naval capabilities and innovative small-unmanned surface technologies capable of recognizing, intercepting, and preventing threats to the United States and her allies." AR Tab 3a at 4.

vendors participated in the Industry Day, including ten that identified themselves as small businesses. AR Tab 8 at 120; AR Tab 3b.

In addition to holding the Industry Day, NAVSEA issued a Sources Sought Notice or Request for Information ("RFI") on behalf of PMS 420. AR Tab 4. Its stated purpose was "to determine if sources exist that can satisfy the Navy's anticipated program requirements for the [littoral combat ship mission module] program." Id. at 60–61. The Navy advised that it sought "to understand industry capabilities to provide production, manufacturing, engineering and sustainment support for the [littoral combat ship mission modules]." Id. at 61.

With respect to O&S services, the RFI asked potential sources to explain, among other things, how they would "support pier side maintenance, intermediate maintenance, and field engineering support" both within and outside the continental United States and how they would "manage staffing to ensure that there is adequate coverage for all maintenance activities including surge periods and high-demand scenarios for [stateside] and [overseas] Operations." Id. at 63. The RFI also asked respondents to state whether they had "worked with MPSF, MMRC, and/or similar large scale storage facilities [stateside]/[overseas]" and to describe their experience providing organizational and intermediate level maintenance for modular systems as well as identify the specific systems and/or components the source had supported in the past. Id. Lastly, the RFI asked that respondents describe how they would "ensure timely and effective communication and collaboration with the Original Equipment Manufacturer (OEM) to resolve maintenance issues that arise during the Sustainment Phase." Id. at 64.

## III. The Results of the Market Research

Saronic did not attend Industry Day or respond to the RFI. See AR Tab 4a. However, the Navy received 18 "comprehensive responses" from other vendors. AR Tab 8 at 119; see AR Tab 4a. It reported that there were seven sources that could meet the Navy's O&S needs as to both the littoral combat ship mission modules and the sUSVs and that these sources were likely to bid on the sustainment contract. The likely bidders identified in the Market Research Report included Northrop Grumman, the holder of the incumbent contract. AR Tab 8 at 122, 125.

Based on its Market Research, the Navy determined that the littoral combat ship mission module contracts were not suitable for a small business set-aside. Id. Its conclusion was based on

> the complexity of the program technology, responding vendors' limited or no familiarity with large scale NAVSEA product delivery requirements . . ., the required facility capacity and capability for [mission package] production, the global complexity . . . of all sustainment support requirements, and simply the level of 'in house' resources required to successfully execute the [Mission Module] Program in terms of [Mission Package] Production and [Mission Package] and sUSV Sustainment.

Id.

The Navy determined that there were two small businesses that could partially meet the agency's needs with respect to hardware production. Id. at 120–21. But neither of those businesses had the size or scale to support the Navy's O&S support needs across five global locations. Id.

The Market Research Report recounts that the Navy planned to decouple the Production and Sustainment programs, which it hoped would increase competition and give small and medium sized companies the opportunity to bid on one or both requirements. Id. at 125. "Unfortunately," it concluded, "based on responses to our Sources Sought Notice, in-person engagement sessions during Industry Day, and additional video teleconferences with requesting vendors," the Navy was unable to identify a small business that might be capable of successfully bidding on either or both the Production and Sustainment Requests for Proposals ("RFPs"). Id.

In short, the Report explained, "[g]iven the large number of responses to the RFI and attendance at Industry Day, the Navy has determined that there are several companies capable of executing either or both the LCS [mission package] Production and LCS [mission package] and sUSV Sustainment requirements." Id. It recommended "[f]ull and open solicitation of both the LCS [mission package] Production Contract and the LCS [mission package] and sUSV Sustainment Contract, released in tandem to prevent any confusion with our industry partners . . . ." Id. at 126.

## IV. This Action

On July 1, 2025, three months after the Market Research Report was finalized, the Navy announced its intent to issue two solicitations pursuant to FAR part 15 procedures. AR Tab 10a at 151. The first solicitation would cover hardware production for littoral combat ship mission modules and the second would encompass O&S services for both littoral combat ship mission modules and sUSVs. The Navy issued the latter solicitation, Solicitation No. N00024-26-R-6311, on January 16, 2026, setting a closing date of March 6, 2026. AR Tab 16.

Saronic did not submit an offer in response to the Solicitation. In its complaint, Saronic explains that it "downloaded and reviewed the Solicitation, intended to compete, and began assessing the requirements" but concluded that "it could not fairly submit a proposal due to the terms and conditions challenged" in its complaint. Compl. ¶ 16. Therefore, on March 4, 2026, two days before proposals were due, it filed the present bid protest.

Saronic filed its motion for judgment on the administrative record on May 6, 2026. Pl.'s Mot. for J. on the Admin. R. [hereinafter Pl.'s Mot.], ECF No. 21. In response, on June 10, 2026, the government filed a combined motion to dismiss Saronic's claims pursuant to RCFC 12(b)(6) for lack of statutory standing and cross-motion for judgment on the administrative record. Def.'s Mot. The Court held oral argument on the motions on October 6, 2026.

On October 15, 2026, the Court issued an order denying the government's motion to dismiss, as well as Saronic's motion for judgment on the administrative record, and granted the government's motion for judgment on the administrative record. Order, ECF No. 42.

# DISCUSSION

## I. The Government's Motion to Dismiss Based on Lack of Statutory Standing

The government has filed a motion to dismiss Saronic's complaint in accordance with RCFC 12(b)(6) for failure to state a claim. It contends that the allegations in the complaint, taken as true, are insufficient to establish Saronic's standing to challenge the Navy's Solicitation of

bids for the proposed sustainment services contract under 28 U.S.C. § 1491(b)(1). Def.'s Mot. at 7–13. That provision states, in pertinent part, that the Court of Federal Claims has jurisdiction to render judgment in actions "by an interested party objecting to [(1)] a solicitation by a Federal agency for bids or proposals for a proposed contract" or (2) "any alleged violation of statute or regulation in connection with a procurement or a proposed procurement." 28 U.S.C. §1491(b)(1).

Under § 1491(b)(1), an interested party is "an actual or prospective bidder or offeror whose direct economic interest would be affected by the award of the contract or by failure to award the contract." Percipient.AI, Inc., 153 F.4th at 1228; Wks. Marine, Inc. v. United States, 575 F.3d 1352, 1359 (Fed. Cir. 2009) (quoting Am. Fed'n of Gov't Emps. v. United States, 258 F.3d 1294, 1302 (Fed. Cir. 2001)). Saronic's allegations, taken as true, are sufficient to establish its status as an interested party. The Court finds the government's arguments to the contrary unpersuasive.

### A. Saronic's Status as a Prospective Offeror

First, Saronic has alleged facts sufficient to establish its status as a prospective offeror. It claims that by including O&S services for sUSVs and O&S services for littoral combat ship mission modules as requirements in a single Solicitation, the agency violated several statutory and regulatory provisions, foremost among them, 10 U.S.C. § 3453. It further alleges that—to comply with that provision and others—the Navy was obligated to decouple the sustainment requirements for the sUSVs from the sustainment requirements for the littoral combat ship mission modules. Had the Navy done so, Saronic argues, it could and would have submitted an offer and competed for a contract that included in its scope only the sustainment services for sUSVs. Compl. ¶ 16.

Further, Saronic filed its protest here before the closing date for offers set forth in the Solicitation. It has also actively pursued that protest. Therefore, Saronic is eligible to assert interested party status as a prospective offeror. See CGI Fed. Inc. v. United States, 779 F.3d 1346, 1349, 1351 (Fed. Cir. 2015) (holding plaintiff was a "prospective bidder" where it filed its GAO protest before the close of the bidding period and "diligently and continuously pursued its rights in the GAO and then, immediately upon dismissal by the GAO, in the Court of Federal Claims"); Digitalis Educ. Sols., Inc. v. United States, 664 F.3d 1380, 1384 (Fed. Cir. 2012) (observing that "in order to be eligible to protest, one who has not actually submitted an offer must be expecting to submit an offer prior to the closing date of the solicitation" and that the opportunity to be treated as a prospective bidder continues until the proposal period ends (quoting MCI Telecomms. Corp. v. United States, 878 F.2d 362, 365 (Fed. Cir. 1989)); Rex Serv. Corp. v. United States, 448 F.3d 1305, 1308 (same).

The government bases its challenge to Saronic's status as a prospective offeror almost entirely upon its reading of the court of appeals' en banc decision in Percipient. Def.'s Mot. at 9–11. Percipient, however, is inapposite.

In Percipient, the National Geospatial-Intelligence Agency ("NGA") issued a solicitation that sought bids to: (1) build and operate a repository to "store, disseminate, and regulate access to data" and (2) provide "Computer Vision" capabilities. Percipient.AI, 153 F.4th at 1228–29.

Percipient alleged that, while it lacked the capacity to satisfy the repository component of the solicitation, it could offer a commercial platform to provide computer vision capabilities. Id. at 1229.

NGA awarded the contract covering both types of services to CACI. Id. Percipient then reached out to CACI for an evaluation of its commercial platform for use as a subcontractor. Id. After CACI failed to follow up with Percipient, Percipient contacted NGA asking it to evaluate the capabilities of Percipient's product, asserting that NGA was required to do so to comply with 10 U.S.C. § 3453. Dissatisfied with NGA's response to its outreach, Percipient filed suit here. Id. at 1229–30.

The court of appeals held that Percipient lacked statutory standing to pursue its claims. Id. at 1243. The court reasoned that Percipient was not a prospective offeror on the contract awarded to CACI because it never intended to bid on the solicitation as a prime contractor. Id. Rather, it sought to participate in the procurement as a subcontractor. Id. Further, Percipient filed its protest several years after the contract was awarded. Id. at 1229. The court of appeals concluded that Percipient was a disappointed subcontractor and so, by definition, not an interested party. Id. at 1243 (explaining that Congress explicitly contemplated and rejected including subcontractors as interested parties).

In this case, Saronic does not seek to supply the sUSV sustainment services as a subcontractor to any successful awardee for the prime contract. Instead, as set forth above, its argument is that the Navy must restructure the procurement to remove what it alleges are unjustified barriers to commercial service providers like itself being able to compete for the prime contract. The government's reliance on Percipient is therefore unavailing.

### B. Saronic's Non-Trivial Competitive Injury

As noted, to establish statutory standing, Saronic must also show that it had a direct economic interest that would be affected by the award or failure to award the contract. CGI Fed. Inc., 779 F.3d at 1351 (quoting Wks. Marine, 575 F.3d at 1361–62); Sys. Application & Techs., Inc. v. United Staes, 691 F.3d 1374, 1382 (Fed. Cir. 2012) (same). In the context of a pre-award bid protest, on a motion to dismiss, a protester must allege sufficient facts to show that it has suffered a "non-trivial competitive injury which can be addressed by judicial relief." Wks. Marine, 575 F.3d at 1361 (quoting WinStar Commc'ns, Inc. v. United States, 41 Fed. Cl. 748, 763 (1998)).

For purposes of determining the existence of a non-trivial competitive injury at the motion to dismiss phase, a court must "assume that the party will, if permitted to proceed with its claim, prevail on the merits." REV, LLC v. United States, 91 F.4th 1156, 1164 (Fed. Cir. 2024); see also Am. Relocation Connections, L.L.C. v. United States, 789 F. App'x 221, 226 (Fed. Cir. 2019) (observing that "[f]or standing, we presume the party bringing a bid protest will succeed on the merits of its claim and ask whether it has alleged an injury (or prejudice) caused by the procuring agency's actions" (citing Info. Tech. & Applications Corp. v. United States, 316 F.3d 1312, 1319 (Fed. Cir. 2003)).

In this case, the Court must assume that Saronic will succeed on the merits of its claim that the Navy violated 10 U.S.C. § 3453 when it included sustainment services for the sUSVs

and sustainment services for littoral combat ship mission modules in the same Solicitation. See Compl. ¶¶ 62–63. Further, the Court assumes Saronic will prevail on its claims that the Navy should have set aside the procurement for small businesses and that the Navy "bundled" the two sustainment requirements together without adequate justification. Compl. ¶¶ 64–66, 77–93.

The Court further finds that the allegations in the complaint are sufficient to show that—if these alleged errors were rectified, and the two sustainment requirements decoupled—Saronic would have been able to compete for a contract covering the sUSV sustainment services and would have had "greater than an insubstantial chance of securing the contract." Am. Relocation Connections, 789 F. App'x at 226–27; see also CliniComp Int'l, Inc. v. United States, 904 F.3d 1353, 1360 (Fed. Cir. 2018) (noting that to establish prejudice, a pre-award protestor must show that if the error was rectified, it could compete for the new contract).

Thus, Saronic alleges that it "specializes in designing, developing, and producing Autonomous Surface Vehicle ('ASVs') often described as maritime drones—for naval and maritime applications." Compl. ¶ 17. It further alleges that it has secured government contracts "to collaborate on autonomous maritime systems," including an OT agreement with the Navy for the production of Corsair sUSVs, and that it is capable of performing O&S work for sUSVs. Id. ¶¶ 18, 20.

These allegations, if taken as true, suffice to show Saronic could have at least competed for a contract to perform sustainment service for sUSVs, had the littoral combat ship mission module sustainment services been segregated out into a separate procurement as Saronic alleges the law required. Therefore, Saronic has sufficiently alleged that it suffered a non-trivial competitive injury as a result of the actions it challenges in this case and has standing to pursue this protest.

## II. The Cross-Motions for Judgment on the Administrative Record

### A. Standard of Review

The court reviews agency procurement decisions under the standards used to evaluate agency action under the Administrative Procedure Act ("APA"), 5 U.S.C. § 706. Bannum, Inc. v. United States, 404 F.3d 1346, 1351 (Fed. Cir. 2005); see 28 U.S.C. § 1491(b)(4). As such, "[i]n a bid protest case, the inquiry is whether the agency's action was arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law and, if so, whether the error is prejudicial." Glenn Def. Marine (ASIA), PTE Ltd. v. United States, 720 F.3d 901, 907 (Fed. Cir. 2013); see 5 U.S.C. § 706(2)(A).

This "highly deferential" standard of review requires a reviewing court to "sustain an agency action evincing rational reasoning and consideration of relevant factors." Advanced Data Concepts, Inc. v. United States, 216 F.3d 1054, 1058 (Fed. Cir. 2000) (citing Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc., 419 U.S. 281, 285 (1974)). The court cannot substitute its judgment for that of the agency. See Honeywell, Inc. v. United States, 870 F.2d 644, 648 (Fed. Cir. 1989) (holding that as long as there is "a reasonable basis for the agency's action, the court should stay its hand even though it might, as an original proposition, have reached a different conclusion . . . ." (quoting M. Steinthal & Co. v. Seamans, 455 F.2d 1289, 1301 (D.C. Cir. 1971))). Its review is limited to "determin[ing] whether 'the contracting agency provided a

coherent and reasonable explanation of its exercise of discretion.'" Impresa Construzioni Geom. Domenico Garufi v. United States, 238 F.3d 1324, 1332–33 (Fed. Cir. 2001) (quoting Latecoere Int'l, Inc. v. U.S. Dep't of Navy, 19 F.3d 1342, 1356 (11th Cir. 1994)); see also Motor Vehicle Mfrs. Ass'n v. State farm Mut. Auto. Ins. Co., 436 U.S. 29, 43 (1983) (noting that a court should review agency action to determine if the agency has "examine[d] the relevant data and articulate[d] a satisfactory explanation for its action" (quoting Burlington Truck Lines v. United States, 371 U.S. 156, 168 (1962)).

The court reviews bid protests on the basis of the administrative record. Axiom Res. Mgmt., Inc. v. United States, 564 F.3d 1374, 1381 (Fed Cir. 2009); see also Bannum, 404 F.3d at 1353–54. Parties may move for judgment on the administrative record pursuant to RCFC 52.1. The court makes "factual findings under RCFC [52.1] from the record evidence as if it were conducting a trial on the record." Bannum, 404 F.3d at 1357.

The court's inquiry in ruling on a motion for judgment on the administrative record is "whether, given all the disputed and undisputed facts, a party has met its burden of proof based on the evidence of record." XOtech, LLC v. United States, 950 F.3d 1376, 1379–80 (Fed. Cir. 2020) (quoting Palantir USG, Inc. v. United States, 904 F.3d 980, 989 (Fed. Cir. 2018)). Unlike a summary judgment proceeding, genuine issues of material fact do not foreclose the entry of judgment on the administrative record. Bannum, 404 F.3d at 1356.

## III. FASA's Preference for Procuring Commercial Services to Meet Agency Requirements

Under FASA, agencies are obligated to ensure that, "to the maximum extent practicable—[the] requirements of the agency with respect to a procurement of . . . services . . . are defined so that commercial services . . . may be procured to fulfill such requirements" and that "offerors of commercial services . . . are provided an opportunity to compete in any procurement to fill such requirements." 10 U.S.C. § 3453(a); see FAR 11.002(a)(2).[5] Further, and to those ends, FASA requires agencies to "modify requirements in appropriate cases to ensure that the requirements can be met by commercial services." 10 U.S.C. § 3453(b); see FAR 12.101(b).

FASA also requires agencies to "conduct market research appropriate to the circumstances" before developing new specifications for a procurement or soliciting offers. 10 U.S.C. § 3453(c)(1)(A) & (B); FAR 10.001(a)(2); see FAR 12.101(a); see also Palantir, 904 F.3d at 984 (observing that "FASA achieves its preference for commercial items in part through preliminary market research"). An agency conducts market research by "collecting and analyzing

[5] The phrase "commercial services" includes, among other things, installation, maintenance, repair, or training services that are "procured for support of a commercial product" where "the source of such services provides similar services contemporaneously to the general public under terms and conditions similar to those offered to the Federal Government." FAR 2.101. It also includes "[s]ervices of a type offered and sold competitively in substantial quantities in the commercial marketplace[—(A)] based on established catalog or market prices for specific tasks performed or specific outcomes to be achieved[;] and [(B)] under standard commercial terms and conditions." Id.

information about capabilities within the market to satisfy [its] needs" and "obtaining information specific to the [item] being acquired." FAR 2.101; FAR 10.002(b)(1). The "extent of market research will vary, depending on such factors as urgency, estimated dollar value, complexity, and past experience." FAR 10.002(b)(1).

Once an agency has conducted market research, it must use the results of that research "to 'determine' whether there are commercial items that 'meet the agency's requirements; could be modified to meet the agency's requirements; or could meet the agency's requirements if those requirements were modified to a reasonable extent.'" Palantir, 904 F.3d at 990 (quoting 10 U.S.C. § 3453(c)(2)). Agencies are required to document the results of their research "in a manner appropriate to the size and complexity of the acquisition." 10 U.S.C. § 3453(4); FAR 10.002(e).

These provisions "reflect[] Congress's understanding that '[t]he purchase of proven products such as commercial and nondevelopmental items can eliminate the need for research and development, minimize acquisition leadtime, and reduce the need for detailed design specifications or expensive product testing.'" Palantir, 904 F.3d at 983 (alteration in original) (quoting S. Rep. No. 103-258, at 5 (1994), reprinted in 1994 U.S.C.C.A.N. 2561, 2566).[6]

## IV. The Navy's Market Research Efforts Reflect Its Compliance with FASA

The administrative record reflects that the agency met its obligations under FASA to conduct market research and use that research to determine the structure of the procurement, including whether it could use commercial services to meet its requirements and whether it was feasible to set aside the sustainment work for small businesses. It shows that, from the outset, the Navy was interested in increasing the number and types of businesses that could compete to provide sustainment services for both the littoral combat ship mission modules and the sUSVs. That is why it decided to break the existing contract into "two smaller contract vehicles, one for production and one for sustainment . . . ." AR Tab 8 at 119.

As described in some detail above, the Navy's research and its consultations with industry were designed to help determine what impact decoupling the production and sustainment requirements might have on competition. It hosted an Industry Day to discuss "[Littoral Combat Ship] Mission Modules and Small Unmanned Surface Vehicles" on November 1, 2024. AR Tab 3c. Its goal, the Navy explained, was to "increas[e] competition and develo[p] more informed future solicitations within current industry constraints." AR Tab 3c at 51.

Further, the Navy followed up on Industry Day by issuing an RFI. The RFI's stated purpose was to enable the agency "to understand industry capabilities to provide production, manufacturing, engineering and sustainment support for the [littoral combat ship mission modules]." AR Tab 4 at 61. The RFI did not focus on sustainment support for sUSVs. See AR Tab 4. Nonetheless, the agency's Market Research Report reflects that it considered the capacity

---

[6] FASA's policies are reinforced by Executive Order No. 14271, 90 Fed. Reg. 16433 (Apr. 15, 2025). Entitled "Ensuring Commercial, Cost-Effective Solutions in Federal Contracts," the stated purpose of that Order is "to enforce existing laws directing the Federal Government to utilize, to the maximum extent practicable, the competitive marketplace and the innovations of private enterprise to provide better, more cost-effective services to taxpayers." Id.

of the industry respondents to perform those services and identified "several companies capable of executing either or both the LCS [mission package] Production and LCS [mission package] and sUSV Sustainment requirements." AR Tab 8 at 125.

Unfortunately, the Navy's market research revealed that none of the companies capable of performing either or both types of O&S services were small businesses. The Navy therefore recommended a full and open solicitation for both a Production Hardware contract for the LCS mission packages, as well as a sustainment contract for both the LCS mission packages and the sUSVs, that would be "released in tandem to prevent any confusion with our industry partners . . . ." Id. at 126.

## V. Saronic's Arguments Regarding the Navy's Compliance with FASA

Saronic contends that the Navy's determination that there were no commercial sources available that could meet the agency's sustainment needs was conclusory and unsupported. See Pl.'s Resp. to Def.'s Mot. to Dismiss and Cross-Mot. for J. on the Admin. R. [hereinafter Pl.'s Resp.] at 11, ECF No. 27 (citing Pl.'s Mot. at 21–29). It also complains that the Navy's market research—including its RFI—was too focused on the littoral combat ship mission module work and not enough (if at all) on the sUSV requirement. Id. at 12 (citing AR Tab 4). These arguments lack merit.

First, the Market Research report expressly stated that the Navy considered whether there were commercial sources available that could provide sustainment services for both mission modules and sUSVs but determined that there were not. See AR Tab 8 at 124 (checking box stating that "[t]he results of market research have determined that the Government's needs can be met by . . . [i]tems used exclusively for governmental purposes" and not by services "customarily available in the commercial marketplace"); AR Tab 8 at 120–21 (determining that no small business was "[c]apable of bidding on the [littoral combat ship mission package] and sUSV Sustainment RFP as the Prime Vendor via the necessary Operations, Maintenance, Supply and Logistics expertise" at least in part because they had "neither the size nor scale to support Sustainment across 5 global locations").[7]

Significantly, while Saronic takes issue with what is admittedly a less than fulsome explanation of its reasoning, it does not challenge the substance of the Navy's determination that there were no commercial sources available that could provide sustainment services for both the mission modules and the sUSVs. It argues instead that there were commercial sources, including Saronic itself, available to perform O&S services for the sUSVs.

[7] The Acquisition Plan also stated that "[e]xpanded use of commercial products [or] commercial products with modifications . . ." are "[n]ot applicable for the O&S support requirements" and that "[the Navy] will not acquire major weapon systems as commercial products." AR Tab 11 at 212. At the oral argument in this case, however, counsel for the government disavowed the Plan's suggestion that the commercial services preference is applicable because the sUSVs were major weapons systems. Tr. at 48–50 (the government stating that sUSVs are not major weapons systems and that it is not relying on such a designation). The Court is not sure what to make of these conflicting assertions and so does not rely upon them in assessing the reasonableness of the Navy's market research efforts.

At the heart of Saronic's argument is the premise that FASA's requirement that agencies employ commercial services to the maximum extent practicable meant that the Navy was obligated to issue two separate solicitations: one covering sustainment services for sUSVs and another covering services for the mission modules. This premise, however, collides with the broad discretion agencies are afforded in structuring their procurements. See Savantage Fin. Servs., Inc. v. United States, 595 F.3d 1282, 1286 (Fed. Cir. 2010) (explaining that an agency's determination of its "minimum needs 'is a matter within the broad discretion of agency officials . . . and is not for [the] court to second guess'" (quoting Wit Assocs., Inc. v. United States, 62 Fed. Cl. 657, 662 (2004))); Tyler Constr. Grp. v. United States, 570 F.3d 1329, 1334 (Fed. Cir. 2009) (finding that agencies have "broad discretion to determine what particular method of procurement will be in the best interests of the United States in a particular situation"); CHE Consulting, Inc. v. United States, 552 F.3d 1351, 1353 (Fed. Cir. 2008) (upholding decision to combine hardware and software maintenance services into one contract as supported by a rational basis where the agency concluded that "separate hardware and software maintenance providers could disrupt mission-critical service and maintenance response time").

In this case, the Navy's decision to include both types of sustainment services in a single contract vehicle was rational and consistent with the Navy's stated needs and is entitled to deference. It is self-evident from the administrative record that the sUSVs and mission modules are part of an integrated system. As the government observes, "the Navy's sUSV assets are embedded within the broader littoral combat ship operational and sustainment enterprise and rely upon the same facilities, personnel, logistics infrastructure, maintenance organizations, training activities, and fleet-support mechanisms that support the [littoral combat ship mission module] program." Def.'s Mot. at 27. Mission modules and sUSVs may be included together as part of a single mission package. See, e.g., AR Tab 11 at 190, 221; see also AR Tab 3c at 20 (slide depicting "mission packages" as being composed of "mission modules" which in turn include "mission systems" such as sUSVs). Further, LCS mission modules and sUSVs are both managed by the same program office—PMS 420. The sustainment work for the sUSVs is performed at the same facilities (both domestically and abroad) as the sustainment work for LCS MPSFs, MMRCs, and forward operating locations. See, e.g., AR Tab 10b at 162–63; AR Tab 12 at 225. Given these connections and interdependencies, the record reflects that, in the view of the Deputy Program Manager of PMS 420, keeping the two sustainment requirements together "would result in significant benefit both in terms of cost as well as accelerating [the] learning curve on sustaining sUSVs." AR Tab 13 at 241.

To be sure, FASA requires the Navy to determine whether a commercial provider "could meet the agency's requirements if those requirements were modified to a reasonable extent." Palantir, 904 F.3d at 990 (quoting 10 U.S.C. § 3453(c)(2)). But there is nothing in FASA that requires agencies to subordinate their legitimate operational concerns and interests to the commercial preference policy. Nor are they obligated to decouple related requirements into separate contract vehicles to increase the likelihood that a commercial provider might be identified.

Further—contrary to Saronic's contentions—the administrative record does not provide particularly compelling support for its claim that there were commercial providers capable of supplying sustainment services under a contract that covered only the sUSVs. Saronic cites its OT agreement with the Navy as proof of its capabilities in that regard. But so far as the Court can tell on this record, that OT agreement was for the production of the Corsair sUSVs; not the

provision of sustainment services. AR Tab 5. Similarly, Saronic references its GSA schedule price list, which covers the provision of support services to "sustain deployed Saronic systems" inside of the United States.[8] But the Navy needed O&S services that could be provided globally.

Finally, citing Palantir, Saronic contends that the Navy did not provide an adequate explanation for its decision not to decouple the sUSV O&S work from the LCS mission module O&S work. Its determination, according to Saronic, "does not exemplify the product of deliberate, open-minded inquiry, but rather reflects a conclusion that had been fixed 'at an early point in the procurement process, to the exclusion of commercially available alternatives.'" Pl.'s Mot. at 26 (quoting Palantir, 904 F.3d at 989).

Saronic's reliance on Palantir is misplaced. As the court of appeals several times remarked in Palantir, its conclusions regarding whether the agency's determinations were sufficiently explained were based on the specific record in that case. The plaintiff in Palantir repeatedly put the agency on notice that it was capable of providing a commercial item that could be modified to meet the agency's needs. Palantir, 904 F.3d at 993–94 (observing that "[h]ere, the administrative record plainly shows that the Army was on notice that Palantir's product might be a commercial item that would satisfy its requirements, whether as-is or with modifications" but that "[d]espite that notice, the Army's ultimate determination regarding its market research excluded commercial items from consideration in a conclusory fashion"). Based on that record, the court of appeals concluded that the agency "did not rationally use its market research results to determine whether there are available commercial items that: '(A) meet the agency's requirements; (B) could be modified to meet the agency's requirements; or (C) could meet the agency's requirements if those requirements were modified to a reasonable extent.'" Id. at 994 (first quoting 10 U.S.C. § 3453(c)(2); and then quoting FAR 10.001(a)(3)(ii)).

In this case, by contrast, the Navy was not put on notice regarding Saronic's alleged capabilities during the market research period. Saronic did not participate in the Navy's Industry Day nor respond to the RFI the Navy issued. And, as explained above, neither Saronic's OT agreement nor its GSA price list shows that it (or any other supplier of commercial services) was capable of meeting the Navy's requirements for sUSV O&S services. On this record, the Navy was under no obligation to further explain itself. See In re Applied Materials, Inc., 692 F.3d 1289, 1294 (Fed. Cir. 2012) (observing that while the court "may not supply a reasoned basis for the agency's action that the agency itself has not given" it "will uphold a decision of less than ideal clarity if the agency's path may reasonably be discerned") (citation omitted) (first citing Bowman Transp., 419 U.S. at 285–86; and then citing In re Huston, 308 F.3d 1267, 1280–81 (Fed. Cir. 2002)).[9]

---

[8] General Services Administration, Authorized Federal Supply Schedule Price List, GSA Schedule, https://www.gsaadvantage.gov/ref_text/47QTCA26D003X/47QTCA26D003X_Saronic_FSS.pdf

[9] Saronic also argues that the Navy did not comply with the requirement in Executive Order 14271 that the contracting officer provide the "Approval Authority" with the reasons why a non-commercial solution was required. The Executive Order, however, is not a "statute or

The Court has considered Saronic's remaining arguments concerning the Navy's compliance with FASA and finds them without merit. And, because it concludes that the Navy acted within its discretion when it decided not to carve out sUSV sustainment services for provision by commercial sources, the Court rejects Saronic's argument the Navy violated the Competition in Contracting Act by including terms in the Solicitation that it alleges will "deter, if not functionally preclude, commercial entities from competing." Pl.'s Mot. at 25.

## VI. Saronic's Argument that the Navy Improperly Bundled the Two Separate Sustainment Requirements Together

Section 631(j)(3) of Title 15 states that "each Federal agency, to the maximum extent practicable, shall . . . avoid unnecessary and unjustified bundling of contract requirements that precludes small business participation in procurements as prime contractors." Saronic alleges that the Navy engaged in unnecessary and unjustified bundling and therefore violated section 631(j)(3) when it combined in a single procurement the sustainment work for the littoral combat ship mission modules and the sustainment work for the sUVSs. Saronic's argument lacks merit.

Under the FAR, "bundling" is defined as:

> combin[ing] two or more requirements for supplies or services, previously provided or performed under separate smaller contracts . . . into a solicitation for a single contract, a multiple-award contract, or a task or delivery order that is likely to be unsuitable for award to a small business concern (even if it is suitable for award to a small business with a Small Business Teaming Arrangement).

FAR 2.101. A "separate smaller contract" as used in connection with the bundling determination "means a contract that has been performed by one or more small business concerns or that was suitable for award to one or more small business concerns." Id.

The procurement at issue in this case does not involve "bundling" as that term is defined in FAR 2.101. The mission module sustainment work that is combined with the sUSV sustainment work in the Solicitation has most recently been performed by Northrop Grumman, which is not a small business concern. Further the existing contract includes both mission module sustainment services and mission module production work. In the procurement under review, the Navy decoupled the formerly combined procurements for mission module production and sustainment services, in an effort "to increase competition and provide an opportunity for small and medium sized companies to bid as a Prime Vendor on one or both requirements." AR Tab 8 at 125.

Further, the Navy's market research revealed that O&S work is not suitable for a small business concern because of, among other things, "the complexity of the program technology,"

---

regulation" within the meaning of 28 U.S.C. § 1491(b). Tr. at 12 (Pl. acknowledging that the Executive Order is not enforceable in any way). Indeed, the Order states that it is "not intended to, and does not, create any right or benefit, substantive or procedural, enforceable at law or in equity by any party against the United States, its departments, agencies, or entities, its officers, employees, or agents, or any other person." Exec. Reg. 14271, 90 Fed. Reg. 16433.

"[the] responding vendors' limited or no familiarity with large scale NAVSEA product delivery requirements," and "the global complexity (CONUS and OCONUS) of all sustainment support requirements." Id. The suitability determination is one that is within the agency's discretion, and the Court has no basis for setting it aside.

Finally, Saronic does not allege, nor does the record show, that the sUSV O&S work was previously performed by a small business concern. In fact, it is unclear from the record how those services were previously delivered. The Court finds, therefore, that Saronic has failed to show that the procurement at issue here involves unnecessary or unjustified bundling.

### VII. Small Business Set-Aside

Saronic contends that under FAR 19.502-2(b) the Navy was required to set aside the sUSV sustainment work for small businesses. That provision states that "[t]he contracting officer shall set aside any acquisition over the simplified acquisition threshold for small business participation when there is a reasonable expectation that— (1) Offers will be obtained from at least two responsible small business concerns; and (2) Award will be made at fair market prices." FAR 19.502-2(b).

The Navy's market research was focused on whether there were small businesses that could bid to provide O&S services for both the littoral combat ship mission modules and the sUSVs as contemplated under the Navy's Acquisition Plan. The Navy concluded that none of the small businesses it studied had that capacity, and Saronic does not challenge that conclusion. Because the Court has ruled that the Navy acted within its discretion when it decided to use a single contract vehicle to procure the sustainment services for sUSVs and the sustainment services for the mission modules, Saronic's set-aside argument fails.[10]

## CONCLUSION

For the reasons set forth above, the government's motion to dismiss, ECF No. 25, is **DENIED**. Saronic's motion for judgment on the administrative record, ECF No. 21, is also **DENIED**. The government's motion for judgment on the administrative record, ECF No. 25, is **GRANTED**. The Clerk is directed to enter judgment accordingly.

This memorandum opinion has been issued under seal. The parties shall have two weeks to propose redactions and, accordingly, file such proposed redactions by November 6, 2026. To aid the Court's evaluation of the proposed redactions, each party shall file a memorandum

---

[10] Although the Court need not and does not reach the issue, it notes that the Market Research Report raises questions about the capacity of small businesses to bid on a hypothetical procurement for sustainment services for sUSVs alone. Of the ten small businesses the Navy considered, eight were deemed incapable of meeting any of the criteria to bid as a prime vendor on either the production or sustainment contracts. AR Tab 8 at 120–21. The remaining two small businesses were deemed to have met the technical capability requirements to bid on the production of littoral combat ship mission modules, but the Navy concluded that they were not of the size or scale to support sustainment across five global locations. Id.; see also id. at 125 (concluding that both of these small businesses "would be greatly limited in their dexterity to support the rea[-]world operations that would be required of them given [the Navy's] present and planned future force posture both stateside (i.e. CONUS) and overseas (i.e. OCONUS)").

explaining why redactions are necessary for each item of information for which a redaction is proposed.

**IT IS SO ORDERED.**

s/ Elaine D. Kaplan
ELAINE D. KAPLAN
Judge